Argued August 24, affirmed as modified and
remanded November 13, 1973

STATE OF OREGON, *Respondent, v.* PAUL
ANTHONY DAZHAN, JERYL RAY SEARS
(No. 42093), *Appellants.*
516 P2d 92

*J. Marvin Kuhn,* Deputy Public Defender, Salem, argued the cause for appellants. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Scott McAlister,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before LANGTRY, Presiding Judge, and FORT and THORNTON, Judges.

FORT, J.

This is a criminal case in which the defendants were charged with the crime of assault in the first degree. Defendants entered pleas of not guilty and were tried by a jury, which found defendant Sears guilty of the crime charged and defendant Dazhan guilty of the lesser included offense of assault in the second degree.

On January 28, 1973, at approximately 11:30 p.m., Robert Lacey and Linda Adams went to the lounge of the Blue Ox in Albany, Oregon. Mr. Lacey testified that while he and Miss Adams were leaving, at about 12:30 a.m., a stranger approached them and asked for a ride home. Mr. Lacey agreed, believing that

only two people were requesting a ride. When he arrived at his car, he noticed four other persons standing there, making a total of four men and two women. Mr. Lacey identified the defendants among those who were seeking a ride and testified that, aside from noticing one of them at the Blue Ox earlier that evening, he had never seen either of the defendants before that time. Mr. Lacey was given directions as to how to take the people home, and after driving for awhile, Mr. Lacey was told to pull over, whereupon several of the occupants began to get out of the car. Defendant Sears then told Mr. Lacey to get out of the car. When Mr. Lacey refused, defendant Sears attempted to grab Mr. Lacey, but missed. Defendant Dazhan then pulled Mr. Lacey out of the car.

Robert Lacey, the complaining witness, testified:

"Q [By deputy district attorney] Then, what took place?

"A They started throwing punches.

"Q Who struck you first, do you know?

"A I think he did (indicating).

"Q By 'he' you mean the man closest to me?

"A Yes.

"Q What happened as a result of that punch?

"A Nothing really, it was just a punch.

"Q What did you do?

"A I think I swung back.

"Q Then, what happened?

"A Well, then everyone of the other three guys joined in.

"Q What happened to you?

"A Well, I got knocked down quite a few times and got cut up.

"Q While you were knocked down, can you tell the jury what you were being struck with or by?

"A Mostly feet when I was down.

"* * * * *

"Q Can you tell the jury approximately how long this beating, this striking and so forth went; on?
"A For about ten minutes, I guess."

Miss Adams corroborated the foregoing and added:

"A After they pulled him out he fell on the ground and then all of them kind of stood there and one of them kicked him—I don't know—they were hitting and kicking him and every time he would get up they would knock him down.

"Q [by deputy district attorney] And do you know what he was being hit with?
"A They were hitting him with their fists and I saw him get kicked in the chest and sides and when he got up they hit him in the face.

"* * * * *

"Q What stopped it, if you know?
"A One of the boys finally said to leave him alone and that he had enough and they started to walk off and then Sears went back and hit him again and they said leave him alone again, you're going to kill him and then they all left.

"Q How did Bob get into the car?
"A Dazhan walked back and helped him up and brought him to the car."

Mr. Lacey then proceeded to drive Miss Adams home to Sweet Home. When they arrived her mother suggested they go to the hospital. Miss Adams drove Mr. Lacey from Sweet Home to the Lebanon Hospital. Mr. Lacey was there for about an hour and then drove home. He suffered a cut under the right eye, a cut under the right eyebrow, a severe black eye, a cracked nose and bruises on his chest. A doctor stitched the cuts about the eye and X-rayed Mr. Lacey's skull.

The doctor's report states that Mr. Lacey was "very uncooperative" and had a "strong odor of al-

cohol." Mr. Lacey testified he was a little drunk. He also testified his right eye was so swollen he could not see from it for about a week and a half, but that there has been no problem and no impairment of his vision since that time. There was a permanent scar under the right eye.

Subsequently, the following afternoon, Mr. Lacey and Miss Adams reported the incident to Officer Martin of the Albany Police Department. During this interview, the defendants were identified from a group of photographs which Officer Martin showed to Mr. Lacey and Miss Adams.

The principal assignment of error is that their convictions cannot stand because Mr. Lacey's injuries were not, as a matter of law, "serious" as required by ORS 163.175 and 163.185. We agree.

ORS 163.175 provides:

"(1) A person commits the crime of assault in the second degree if he:

"(a) Intentionally or knowingly causes serious physical injury to another; or

"(b) Intentionally or knowingly causes physical injury to another by means of a deadly or dangerous weapon * * *

"* * * * * *

"(2) Assault in the second degree is a Class C felony."

ORS 163.185 provides:

"(1) A person commits the crime of assault in the first degree if he intentionally, knowingly or recklessly causes serious physical injury to another under circumstances manifesting extreme indifference to the value of human life.

"(2) Assault in the first degree is a Class B felony."

"Serious physical injury" is defined in ORS 161.015 (7) as:

"* * * physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

Although Mr. Lacey received a severe beating by the defendants, his injuries are not "serious" within the meaning of ORS 161.015 (7). As he testified at the trial, he suffered no permanent physical impairment; no loss of eyesight; and any scars which may have been caused could certainly not be characterized as "serious and protracted disfigurement." As stated in the Proposed Oregon Criminal Code Final Draft and Report, 95-6, Commentary, Art 11, § 94 (1970):

"The proposed draft embodies a reorientation of present Oregon law. It limits assault as a concept to the infliction of actual physical injury. * * *

"It is intended that an attempt to commit an assault is a lesser included offense and that the conviction will be for the attempt where it, but not the assault, is established by the evidence. (See §§ 54-56 supra.)"[1]

A recent, similar case is *State v. Mayo,* 13 Or App 582, 585-86, 511 P2d 456, Sup Ct *review denied* (1973), we said:

"Looking at the evidence in the light most favorable to the state, *State v. Redeman,* 9 Or App 329, 496 P2d 230 (1972), the record shows that defend-

---

[1] We note that no question is here raised, nor was it submitted to the jury, whether the acts of either or both defendants constituted an attempt to inflict serious physical injury.

ant struck Officer Potter on the back of the head with his fist and later kicked him in the chest area while Potter was on the ground. This is sufficient to show defendant's intent. But was the injury which defendant caused 'serious physical injury?' When Officer Potter was brought into the hospital his only injuries were lacerations over the bridge of his nose and over his right eyebrow. No skull fracture was found and Officer Potter was required to stay only overnight in the hospital.

"Referring to the statutory definition of 'serious physical injury,' the state introduced no evidence that Officer Potter's facial injuries caused 'serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ,' nor did it attempt to show that the kick to his chest area resulted in any injuries whatsoever. The state appears to have relied solely on proving that the injuries inflicted created 'a substantial risk of death.' To do so, the state qualified Officer Potter's treating physician as an expert witness, but the physician specifically stated that he could not say that the totality of the injuries inflicted on Officer Potter created a 'substantial risk of death,' but only that they created 'a possibility of risk of death.' There was thus no evidence that Officer Potter sustained 'serious physical injury,' and thus the conviction of assault in the second degree cannot be sustained."

We note that assault in the second degree, ORS 163.175, can be committed where less than a serious physical injury is inflicted if a deadly or dangerous weapon has been used. ORS 163.175 (1) (b). "Dangerous weapon"[2] is defined in ORS 161.015 (1) as:

" 'Dangerous weapon' means any instrument,

---

[2] The Proposed Oregon Criminal Code Final Draft and Report 3, Commentary, Art 1, § 3 (1970) states:

"Subsections (1) 'dangerous weapon' and (2) 'deadly

article or substance which under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury."

However, the court here instructed only that assault in the second degree can be committed by inflicting serious physical injury to another. ORS 163.175 (1) (a) and (c). No instruction was requested or given that the crime of assault in the second degree may also be committed by intentionally or knowingly causing phys-

weapon' must be considered together because these definitions attempt to distinguish between those instruments, articles or substances that are specifically designed to be used as 'weapons' and those which, because of the circumstances in which they are used or attempted to be used, become 'weapons.' The definition of 'dangerous weapon' is substantially the same as the definition of 'dangerous instrument' in § 10.00 (13) of the New York Revised Penal Law. The draft does not use the New York definition of 'deadly weapon' which is merely an itemized list of well-known weapons, but nevertheless uses the same rationale.

" 'Weapon' is defined in *Words and Phrases* as 'an instrument of offensive or defensive combat.' The courts generally have not drawn a clear distinction between a deadly weapon and a dangerous one. A deadly weapon is often defined as a weapon likely, from the manner of its use, to produce death or great bodily injury. (The draft definition of 'dangerous weapon' is closer to this one.) But, as one court observed in *Pittman v. State*, 25 Fla 648, 6 So 437, '. . . any weapon is a deadly weapon which is likely to produce death, but a weapon capable of producing death is not necessarily likely to produce death.'

"*State v. Rosever*, 8 Wash 43, 35 P 357, indicates a basis of distinction between 'deadly' and 'dangerous' weapons in this statement:

" 'Some weapons are per se deadly; others, owing to the manner in which they are used, become deadly.'

"This is the foundation on which the draft definitions are laid: A *deadly* weapon is labeled so because of the nature of the instrument itself, whereas a *dangerous* weapon is one which has become such due to the use it is put to. This, then, places the determination of the former on the court as a matter of law, the latter on the jury as a question of fact to be decided under proper court instructions."

ical injury to another by means of a deadly or dangerous weapon. ORS 163.175 (1) (b).[9] Since the jury is bound to accept the law as stated by the court, ORS 136.320, we must conclude it did not consider ORS 163.175 (1) (b) as a basis for its verdict. Accordingly, we do not find it necessary to consider whether the use of a shoe employed as here constitutes a "dangerous weapon" under ORS 161.015 (1).

Nevertheless, as stated in *State v. Mayo,* supra, 13 Or App at 586-87:

"* * * [I]t is clear that the jury found that Officer Potter did sustain 'physical injury' within the meaning of ORS 163.165, assault in the third degree, and it is also clear that the jury found that defendant caused this injury with the mental state ('intentionally, knowingly or recklessly') required by that statute. We have thus a finding of guilty

---

[9] For a recent case discussing the problems of drafting an indictment with two theories of committing the same crime, see State v. Hanson/Hughes, 14 Or App 586, 513 P2d 1202, Sup Ct *review denied* (1973).

The indictment in this case may have been subject to the same criticisms.

"The above named defendants are accused by the Grand Jury of the County of Linn, by this indictment of the crime of Assault in the First Degree committed as follows:

"The said PAUL ANTHONY DAZHAN, JERYL RAY SEARS and PATRICK ANTHONY HURLEY, acting together and each aiding and abetting the other, on the 29th day of January A.D. 1973, in the County of Linn, State of Oregon, then and there being, did unlawfully, intentionally and knowingly, under circumstances manifesting extreme indifference to the value of human life, cause serious physical injury to Robert Allen Lacy, by beating and kicking the said Robert Allen Lacy about the head and chest with the defendants' hands and feet, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon.

"Dated at Albany, Linn County, Oregon, this 22nd day of February, A.D. 1973.

"/s/ Jackson L. Frost
District Attorney, Linn County, Oregon."

by the jury of the lesser included offense of assault in the third degree. In such a situation where the '* * * court shall be of opinion that it can determine that judgment should have been entered in the court below, it shall direct such judgment to be entered * * *.' Oregon Constitution, Art VII, § 3. * * *"

That rule has equal application here. There was ample evidence to support such verdict.

We therefore remand the case for entry of judgments of guilty of assault in the third degree and for resentencing on that basis. *See also: State v. Zadina,* 1 Or App 11, 457 P2d 670 (1969).

Affirmed as modified and remanded.